IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| KEITH D. FORD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 04-0598-CV-W-ODS |
| ) | |
| SMURFIT-STONE CONTAINER ) | |
| CORPORATION and DAVE MARTIN, ) | |
| ) | |
| Defendants. ) | |

## ORDER AND OPINION GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING COUNTS II AND III FOR LACK OF SUBJECT MATTER JURISDICTION

Pending is Defendants' Motion for Summary Judgment (Doc. #37). For the following reasons, Defendants' Motion is granted in part and Counts II and III of Plaintiff's Complaint are dismissed without prejudice.

## BACKGROUND

Plaintiff Keith Ford was hired by Smurfit-Stone Container Enterprises, Inc (Smurfit-Stone) in November 2000 as a third shift Second Helper on the D-Ward. Plaintiff was a member of the Union and subject to the Collective Bargaining Agreement. Plaintiff was subsequently promoted to third Shift Senior Second Helper, which gave him the choice of machines and wards. Plaintiff chose to move to the C-Ward. When Plaintiff was promoted to third shift First Helper, he chose to move to the E-Ward. When given the option to change shifts, Plaintiff chose to transfer to first shift and D-Ward First Helper. The move caused a wage cuts of $.24 to $.25 an hour, but Plaintiff stated that "people love to go to first shift." He remained in this position until he was terminated on April 29, 2004.

Attendance Problems

Shortly after he was hired, Plaintiff began having attendance problems. During his three and half years working for Smurfit-Stone, Plaintiff was absent 52 times. Under the attendance policy in place at all times relevant, more than one absence in a 45 day

period was considered excessive and resulted in a written warning. Continued absences thereafter resulted in, respectively, a second written warning, a final written warning and then termination. The disciplinary steps expired after twelve months. Further, the attendance policy required employees to report to work on time for each scheduled shift. Employees exhibiting perfect attendance for a period of three months automatically move up one disciplinary step. Smurfit-Stone employees are allowed four "free" absences on a rolling twelve month basis. After two months of employment, Plaintiff had used all four free absences. After six months of employment, Plaintiff was at step three of the process. For the majority of his employment, Plaintiff remained in the four step program.

Between January 23, 2001 and January 14, 2004, Plaintiff received several written warnings regarding his excessive absences. Each written warning states the employee has the opportunity to discuss any extenuating circumstances affecting the employee's attendance. Plaintiff signed all but one written warning. On or about June 16, 2003 Plaintiff requested a four week FMLA leave in connection with an appendectomy. Smurfit-Stone confirmed Plaintiff was eligible for such leave on June 17. On January 14, 2004 he was at step three and at risk of termination for an additional unexcused absence. As of April 28, 2004, Plaintiff was at the final step of the process, yet he was absent without notice again. Plaintiff claimed to have taken his children to the emergency room, but could not provide any documentation of such a visit. Plaintiff was suspended pending review of his attendance record. On April 29, 2004, Smurfit-Stone terminated Plaintiff's employment.

Forklift

Smurfit-Stone allows only certified and sufficiently experienced individuals to operate power industrial equipment, including forklifts, without supervision to insure employees' safety and to comply with OSHA regulations. According to the collective bargaining agreement, temporary assignments to open positions are based on qualification levels, not seniority. On March 1, 2004, while working an overtime shift, Plaintiff expressed interest in filling the Finishing Material Handler position for that shift, which included operating a forklift. However, Wayne Sexton was assigned to fill the

2

temporary position. Sexton had over 300 hours of forklift experience compared to Plaintiff's five hours of experience. Plaintiff filed a grievance regarding the forklift incident, claiming he was not allowed to operated the forklift in part because of his race. Smurfit-Stone settled the grievance by paying him the differential $1.38 per hour for the total twelve hours.

Bomb Threat

On March 24, 2004 a Liberty police officer informed plant officials that 911 dispatch had received a possible bomb threat. Management officials searched the plant according to its Bomb Threat Policy and found no bomb. Plaintiff was not at work at the time and heard about the incident from another employee. Plaintiff approached Danny Rule, a plant manager, and informed him that Plaintiff would be conducting his own investigation into the bomb threat. Plaintiff alleges Rule became "openly hostile and screamed obscenities" at him, saying "Damn it, Ford."

Fraternization

During his employment, Plaintiff discovered what he felt was an inappropriate relationship between First Shift Supervisor Mark Pollard and employee Denice Eckleberg[1]. After a dispute with Eckleberg, he claims Pollard "made his life a living hell" by inspecting his work product and speeding up his machine. However, Pollard never disciplined Plaintiff for poor performance. At least one other non-minority employee was also affected when Pollard increased the machine's speed. Plaintiff discussed his concerns with Ann Bennett in the department on Human Resources on two occasions. After Plaintiff contacted Regional Human Resources Director Tim Happ, Plaintiff told Bennett that the situation was "water under the bridge.

Harassment and Discrimination

On or about May 20, 2003 an altercation occurred relating to the operation of the machine between Plaintiff, who was working as a first helper, and Defendant Martin, who was working as a ward operator on the E-Ward. In his Complaint, Plaintiff claims

---

[1]In Plaintiff's Complaint, she is referred to as Denice Eckleberg, while in Defendants' Summary Judgment, she is referred to as Denise Engbroten. To minimize confusion, the Court will refer to her as Denice Eckleberg.

3

Martin attacked him, calling him a "nigger," "boy," and "three-fifths of a man." He further claims that Martin pushed him and had to be restrained by other employees. On the day of the incident, Plaintiff reported that Martin called him "boy" which he interpreted to mean "nigger." Plaintiff did not allege Martin actually used the word "nigger." Martin claims that he called Plaintiff a boy after Plaintiff told him to stop treating him like a boy. Both Martin and Plaintiff were suspended for the remainder of their shift as a result of the altercation. Plaintiff asserts that prior to the altercation, the two were friends. However, after the altercation, Plaintiff claims Martin harassed him by kicking his heels, ignoring him, blowing dust from the machine in his face and not opening the machine wide enough. Plaintiff only made one complaint to a supervisor (Martin Gomez), who helped Plaintiff in closing and opening the machine wider.

Plaintiff does not allege that any management level employee ever made a comment regarding his race. However, he claims Pollard discriminated against him based on his race because he felt as if he was "singled out." Pollard never made any race-based comments and any problems relating to Pollard started with the issues concerning Eckleberg and the bomb threat incident. Similarly, Plaintiff believes that both Lee Short and Rule liked him prior to the bomb threat incident and admitted that Eckleberg did not treat him differently because of his race.

Plaintiff filed a Complaint, alleging eight separate counts in July 2004. Defendants served Plaintiff with their Requests for Admission on January 11, 2005. Plaintiff did not seek leave of Court or written permission, but did not answer until June 2005, over three months after their due date. Defendants filed a Motion for Summary Judgment in December 2005. Plaintiff failed to respond to the Motion. On January 26, 2006, the Court ordered Plaintiff to show cause why he had not responded or, in the alternative, why Defendants' Motion should not be granted. Plaintiff did not respond and the time for doing so has passed.

## DISCUSSION

### Standard

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The moving party bears the initial burden of demonstrating the absence of genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show there is a genuine issue of material fact left for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Count I: First and Fourteenth Amendment Claims

     Plaintiff alleges Defendants violated his First and Fourteenth Amendment rights by retaliating against him for questioning how they handled the bomb threat. However, neither Defendant is a state actor. Absent state action, Plaintiff's Constitutional claims must fail as a matter of law. United States v. Morrison, 529 U.S. 598, 621 (2000). Because there is no state actor involved, Defendants' Motion for Summary Judgment on Count One is granted.

Count IV: Disparate Treatment and Hostile Work Environment

     Section 1981's Right-to-Contract Clause provides that all persons shall have the same right to "make and enforce contracts." 42 U.S.C. § 1981(a). In 1991, Congress expanded the scope of section 1981 to include the right to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Thus, section 1981 is designed to prohibit racial discrimination in a contractual relationship. See Youngblood v. Hy-vee Food Stores, Inc, 266 F.3d 851, 854 (8th Cir. 2001).

In Count IV, Plaintiff claims disparate treatment based upon his race in the handling of the altercation between Plaintiff and Defendant Martin. After the May 20, 2004 incident, both men were suspended for the remaining two hours of their shift. Martin, a Caucasian, was disciplined in the same manner as Plaintiff, an African-American. Plaintiff further claims that he was subject to a hostile work environment based upon the resulting relationship with Defendant Martin after the above-mentioned altercation.

To establish a race-based hostile work environment claim, a plaintiff must show that: (1) he or she is a member of a protected group; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment. Diaz v. Swift-Eckrich, Inc., 318 F.3d 796, 800 (8th Cir.2003). Plaintiff, an African-American, is a member of a protected group and therefore meets the first prong of the claim. Furthermore, Plaintiff's allegations, if proven, would show that he was referred to by a derogatory name in the workplace.

However, Plaintiff is unable to prove the harassment affected a term, condition, or privilege of his employment. For harassment to affect a condition of employment, the conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." Singletary v. Missouri Dept. of Corrections, 423 F.3d 886, 892 (8th Cir. 2005). Racial slurs alone do not render a work environment hostile as a matter of law. Id. at 893. Plaintiff alleges only one incident where a racial slur was used, in the heat of an altercation between Plaintiff and Defendant Martin. Plaintiff's additional allegations of harassment, occurring between May and June 2003, included Martin bumping him, ignoring him, failing to open the machine wide enough, and blowing dust from the machine into Plaintiff's face. In June 2003, Plaintiff moved to the first shift and no longer worked with Martin. Even if proven, these allegations of short term incidents do not rise to the level of a hostile work

environment. Therefore, Defendants' Motion for Summary Judgement on Count IV is granted.

Count V: Retaliation and Hostile Work Environment

Plaintiff further contends Defendants violated 42 U.S.C. § 1981(b) as a result of his contentious relationship with Eckleberg. Plaintiff alleges she stated she would make his life "a living hell" and often required him to work overtime. As stated above, Plaintiff is a member of a protected class. However, his §1981 analysis ends after the first element. Smurfit-Stone has an involuntary overtime policy that is referred to as being "forced over" when the workload calls for it. The forced-over list is based on seniority. Plaintiff being required to work over time, or being forced over, had nothing to do with his race, but rather his seniority status with the company. Moreover, Plaintiff sets forth in the Complaint Eckleberg's negative treatment towards him began after he discovered and made comments about an alleged extramarital affair between Eckleberg and Pollard.

To establish retaliation, Plaintiff must show that (1) he engaged in a statutorily protected activity, (2) an adverse employment action was taken against him and (3) a causal connection existed between the protected activity and the adverse employment action. See Kiel v. Select Artificials, Inc., 169 F. 3d 1131, 1136 (8th Cir. 1999). Plaintiff does not assert that he engaged in a statutorily protected activity. Working required overtime was part of Smurfit-Stone's policy. Beyond that, "making reports about fraternization" is also not a protected activity. Because Plaintiff has not established a protected activity or harassment based upon his race, Defendants' Motion for Summary Judgment on Count V is granted.

Count VI: Discrimination in Promotions

Plaintiff claims Smurfit-Stone discriminates in the manner it promotes, but only cites to one incident in which Plaintiff was not chosen to work for one shift as a Finishing Material Handler. A temporary transfer to a position, or a denial of such transfer, is not adverse employment action absent some other change in terms. Brown v. Brody 199 F. 3d 446, 459 (D.C. Cir. 1999). Smurfit-Stone temporarily fills open positions on a shift by shift basis, based on experience and qualification, not seniority. On the date in question,

7

the temporary position was filled by Sexton, who had over 300 hours of forklift experience, compared to Plaintiff's five.

Under the burden-shifting framework of McDonnell Douglas, the complainant has the burden of establishing a prima facie case, "showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications." Sallis v. University of Minn. 408 F.3d 470, 475 (8th Cir. 2005). The burden then shifts to the employer who must articulate a legitimate nondiscriminatory reason for the employee's rejection. If the employer meets this burden, the presumption of discrimination fails and the complainant must show that the employer's nondiscriminatory reason is, in reality, a pretext. Plaintiff's claim fails under McDonnell Douglas.

It is established that he is African-American. To fill a temporary fork-lift position, Smurfit-Stone had a well established experienced-based policy. Whichever employee had the most experience and was available could fill the position. At the time, both Plaintiff and Sexton were available to fill the position. However, Sexton had over 300 hours of forklift experience compared to Plaintiff's five hours. Smurfit-Stone did not discriminate against Plaintiff by not allowing him to fill that position. Defendant's Motion for Summary Judgment on Count VI is granted.

Count VII: Disparate Treatment

In Count VII of his complaint, Plaintiff again claims he was injured as a result of Smurfit-Stone's pattern and practices of discrimination. He does not allege any additional facts to support this claim. As stated above, Plaintiff's claim fails because he has failed to show any disparate treatment based upon his race. Defendant's Motion for Summary Judgment on Count VII is granted.

Count VIII: Retaliation for FMLA Leave

To establish a prima facie case of Leave Act retaliation, Plaintiff must show that he exercised rights afforded by the Act, that he suffered an adverse employment action, and that there was a causal connection between his exercise of rights and the adverse

8

employment action. Smith v. Allen Health Systems, Inc., 302 F.3d 827, 832 (8th Cir. 2002).

In June 2003, Plaintiff was approved for a four-week FMLA leave as a result of an appendectomy. However, he cannot show that he suffered an adverse employment action as a result of the leave. While Plaintiff was on leave, Short called Plaintiff to inform him of an opening on the first shift. Most employees who move from the second or third shifts to first shift are initially assigned to the D-Ward. The move to first shift from third shift resulted in a pay differential of $.24 to $.25 per hour. Plaintiff chose to move from third to first shift, knowing of the pay differential. He even admits that "people love to go first shift." Plaintiff cannot establish that his move and pay cut was an adverse employment action, much less an adverse employment action as a result of his FMLA leave. Therefore, Defendant's Motion for Summary Judgment on Count VIII is granted.

Counts II and III: Assault and Battery

When federal-law claims are disposed of in summary judgment, the court has discretion to dismiss the state-law claims without prejudice, giving Plaintiff the option to reassert them in state court. Figg v. Russell, 433 F.3d 593, 600 (8th Cir. 2006). Therefore, Plaintiff's state-law claims, Counts II and III are dismissed without prejudice.

## CONCLUSION

Therefore, Defendants' Motion for Summary Judgment is granted in part and Counts II and III are dismissed without prejudice.

IT IS SO ORDERED.

Date: February 21, 2006 /s/  Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT